Slip Op. 09-9

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHRYSLER CORPORATION,<br><br>                  Plaintiff,<br><br>     v.<br><br>UNITED STATES,<br><br>                  Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 07-00041 |

**OPINION**

[Summary judgment for Plaintiff denied; summary judgment for Defendant granted.]

Dated: January 29, 2009

    Barnes, Richardson & Colburn (Alan Goggins, Lawrence M. Friedman, Carolyn D. Amadon, Eric W. Lander) for Plaintiff Chrysler Corporation.

    Michael F. Hertz, Deputy Assistant Attorney General, Jeanne E. Davidson, Director, Todd M. Hughes, Deputy Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, (Tara K. Hogan, Trial Attorney and Richard McManus, Attorney, Office of Chief Counsel for U.S. Customs and Border Protection, U.S. Department of Homeland Security) for Defendant United States.

    Gordon, Judge: This case is before the court on cross-motions for summary judgment. Plaintiff, Chrysler Corporation, challenges the decision of the United States Customs and Border Protection ("Customs") denying Plaintiff's protest of Customs' refusal to refund harbor maintenance taxes Plaintiff allegedly paid on exports prior to July 1, 1990. The court has jurisdiction pursuant to 28 U.S.C. § 1581(a). For the reasons set forth below, the court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

## I. Background

In 1986 Congress enacted the Harbor Maintenance Tax ("HMT"), 26 U.S.C. § 4461(a). As originally enacted the HMT obligated exporters, importers, and domestic shippers to pay a percentage of the value of their commercial cargo shipped through the nation's ports. The HMT is collected by Customs and deposited in the Harbor Maintenance Trust Fund ("Trust Fund") from which Congress may appropriate funds to pay for harbor maintenance and development projects. See 26 U.S.C. § 9505 (2000).

In March 1998 the Supreme Court held that the HMT collected on exports was unconstitutional because it violated the Export Clause of the Constitution, U.S. CONST., ART. I, § 9, cl. 5. United States v. U.S. Shoe Corp., 523 U.S. 360, 370 (1998). After U.S. Shoe the U.S. Court of Appeals for the Federal Circuit held that Customs' denial of a request for refund of HMT collections is a "protestable decision" actionable in the U.S. Court of International Trade under 28 U.S.C. § 1581(a). Swisher Int'l, Inc. v. United States, 205 F.3d 1358, 1369 (Fed. Cir. 2000).

After Swisher Customs received thousands of HMT administrative refund requests. At the time, Customs' refund regulation required claimants to present proof of payment documentation (usually Customs Form 349). 19 C.F.R. § 24.24(e)(4) (2000). Claimants who had not retained this documentation began submitting requests for copies pursuant to the Freedom of Information Act ("FOIA."). After receiving copies of their payment documentation from Customs, exporters would return them to Customs and request a refund.

Court No. 07-00041 Page 3

To minimize the burden of responding to FOIA requests and streamline the refund process, Customs issued interim regulations, Amended Procedure for Refunds of Harbor Maintenance Fees Paid on Exports of Merchandise, 66 Fed. Reg. 16,854 (Mar. 28, 2001) (interim rule).  Customs then received comments, and issued a final rule amending the refund regulation, Amended Procedure for Refunds of Harbor Maintenance Fees Paid on Exports of Merchandise, 67 Fed. Reg. 31,948, 31,949 (May 13, 2002) (final rule).

For refunds of unconstitutional HMT collections made after July 1, 1990, Customs eliminated the requirement to submit supporting documentation because Customs verifies those refund amounts using the documentation already in its possession.  67 Fed. Reg. at 31,949 (19 C.F.R. § 24.24(e)(4)(iv)(A) & (C)).[1]  For refunds of unconstitutional HMT collections made prior to July 1, 1990, however, Customs retained the proof of payment requirement.  Id.   Customs no longer possessed documentation for pre-July 1, 1990 payments, and could not independently verify those payments.  Id.  Verification was important for Customs in promulgating the rule because "experience with older payments recorded in the [HMT] database has shown that the database is unreliable."  67 Fed. Reg. at 31,950.

For refunds of pre-July 1, 1990 payments, exporters must submit "supporting documentation" to verify proof of payment.   19 C.F.R. § 24.24(e)(4)(iv)(A)&(C).  Generally, the supporting documentation demonstrating entitlement to a refund is the same documentation submitted to Customs at the time of payment:

---

[1] Unless otherwise noted, further citations to 19 C.F.R. § 24.24 are to the version contained in the final rule set forth in 67 Fed. Reg. at 31,953-55.

> a copy of the Export Vessel Movement Summary Sheet; where an Automated Summary Monthly Shipper's Export Declaration was filed, a copy of a letter containing the exporter's identification, its employer identification number (EIN), the Census Bureau reporting symbol, and, the quarter for which the payment was made; or a copy of a Harbor Maintenance Fee Quarterly Summary Report, Customs Form 349, for the quarter covering the refund request.

19 C.F.R. § 24.24(e)(4)(iv)(C). These documents, however, are not the sole means of establishing proof of payment:

> Customs also will consider other documentation offered as proof of payment of the fee, such as cancelled checks and/or affidavits from exporters attesting to the fact that all quarterly [HMT] payments made by the exporter were made exclusively for exports, and will accept that other documentation as establishing entitlement for a refund only if it clearly proves the payments were made for export harbor maintenance fees in amounts sought to be refunded and were made by the party requesting the refund or the party on whose behalf the refund was requested.

Id.

To assist exporters in identifying pre-July 1, 1990 payments and locating supporting documentation, Customs took on the obligation to search its records (both its electronic database and paper document sources) while processing a refund request, and to issue a report to the exporter (entitled the "HMT Payment Report") listing all export payments reflected in Customs' records for the entire period the HMT was in effect. 19 C.F.R. § 24.24(e)(4)(iv)(B)(2).

## II. Uncontested Facts

The following facts relevant to Plaintiff's claim are not in dispute. On February 10, 2003, Plaintiff requested a refund of HMT export payments made from 1987 to July 1, 1990 amounting to $782,407.45 and recorded in Customs' HMT database. Plaintiff did not produce any of the "supporting documentation" identified in

19 C.F.R. § 24.24(e)(4)(iv)(C). Customs denied Plaintiff's claim for a refund of the disputed HMT payments, stating that Plaintiff had not provided supporting documentation. Plaintiff timely protested the denial, and Customs denied the protest because Plaintiff provided no supporting documentation for pre-July 1, 1990 payments, as required by regulation.

### III. Standard of Review

The Court of International Trade reviews Customs' protest decisions de novo. 28 U.S.C. § 2640(a)(1). Rule 56 of this Court permits summary judgment when "there is no genuine issue as to any material fact . . . ." USCIT R. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

### IV. Discussion

The HMT refund regulation requires "supporting documentation" for pre-July 1, 1990 payments. 19 C.F.R. § 24.24(e)(4)(iv)(C). Plaintiff did not provide this documentation with either its refund request or protest. Customs, therefore, denied Plaintiff's protest. For Plaintiff to prevail, Plaintiff must overcome the HMT refund regulation.

The starting point for review of the regulation is determining which framework applies to the court's analysis, Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), or Skidmore v. Swift & Co., 323 U.S. 134 (1944). See United States v. Mead Corp., 533 U.S. 218 (2001) (explaining applicability of Chevron treatment or Skidmore treatment to Customs' statutory interpretation). The two-step framework of Chevron applies "when it appears that Congress delegated

Court No. 07-00041 Page 6

authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." Id. at 226-27.

> Within the HMT statute Congress expressly delegated authority to Customs to:
>
> prescribe such additional regulations as may be necessary to carry out the purposes of this subchapter, including but not limited to regulations (1) providing for the manner and method of payment and collection of the tax imposed by this subchapter . . . [and] (4) providing for the remittance or mitigation of penalties and the settlement or compromise of claims.

26 U.S.C. § 4462(i) (2000). When promulgating the current version of the HMT refund regulation, Customs used informal rulemaking under 5 U.S.C. § 553 by issuing an interim rule with an accompanying explanation of the rule's rationale. 66 Fed. Reg. at 16,854. Customs then received comments and issued a final rule addressing the comments. 67 Fed. Reg. at 31,948. For the final rule under review in this case, Customs used "a relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement" having the force of law. Mead, 533 U.S. at 230. The court will therefore apply the Chevron framework in reviewing the Customs' refund regulation.

In United States v. Haggar Apparel Co., 526 U.S. 380 (1999), the Supreme Court explained a court's consideration of an agency regulation within the Chevron framework:

> Under Chevron, if a court determines that "Congress has directly spoken to the precise question at issue," then "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842-843. If, however, the agency's statutory interpretation "fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give [that]

judgment 'controlling weight.'" NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257 1957 (quoting Chevron, supra, at 844).

Haggar, 526 U.S. at 392. Applying these principles in this action, the court notes that the HMT statute does not address the specific method for refunding HMT collections, and therefore, the court must consider whether Customs' refund regulation reasonably accomplishes the statutory purposes.

The purpose of the HMT statute is to provide revenue for the maintenance and development of U.S. ports and harbors. Although the section related to export-related payments was declared unconstitutional, the rest of the statute remains in effect. See 26 U.S.C. §§ 4461, 4462 (2000); Carnival Cruise Lines, Inc. v. United States, 200 F.3d 1361, 1368-69 (Fed. Cir. 2000) (holding export provision severable from other HMT provisions). Customs must still collect and deposit constitutional HMT payments in the Trust Fund. In fashioning procedures for the refund of unconstitutional HMT collections (as well as constitutional collections), Customs could not ignore its continuing obligation to protect the Trust Fund. See Section 484 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1484(a)(2)(C) (2000) ("The Secretary shall also provide, to the maximum extent practicable, for the protection of the revenue.").

Turning to the refund regulation, the court observes that the supporting documentation requirement has been in place, in some form, since 1991. See 19 C.F.R. § 24.24(e)(5) (1992) ("Refund and supplemental payment. Where a refund is requested or a supplemental payment is made, a Harbor Maintenance Fee Amended Quarterly Summary Report, Customs Form 350, should be mailed to the U.S. Customs

Court No. 07-00041                                                                                              Page 8

Service, P.O. Box 70915, Chicago, Illinois 60673-0915, along with a copy of the Harbor Maintenance Fee Quarterly Summary Report, Customs Form 349, for the quarter(s) in which the refund is requested or a supplemental payment is made.")

     Customs relaxed that requirement for post-July 1, 1990 HMT payments to achieve increased administrative efficiency in processing refund claims.  For Customs there was no corresponding risk of overpayment or potential harm to the Trust Fund because government-retained HMT payment records existed to verify the post-July 1, 1990 transactions.  The absence of government-retained HMT payment records for pre-July 1, 1990 payments, however, led Customs to retain the supporting documentation requirement for those transactions.  Customs was reluctant to rely solely on the payment information contained in an HMT database that had proved unreliable.  Customs considered, but explicitly rejected, using its electronic database as the sole method of verifying payment information.  67 Fed. Reg. at 31,950.

     Customs' concern about the electronic database proved well-founded.  Customs has identified and corrected $143,530,474.00 of HMT payments incorrectly coded for export HMT that actually were paid on other HMT categories.  Customs has also identified and corrected $25,905,714.50 of HMT payments incorrectly coded for other HMT categories that actually were paid on exports.  The supporting documentation requirement for pre-July 1, 1990 payments has enabled Customs to "balance its obligation to issue refunds with its obligation to protect the revenue."  Id. at 31,948, 31,950.

Customs' HMT refund regulation requires that most claimants, including exporters seeking refunds of pre-July 1, 1990 export payments, provide Customs with documentation supporting their request for refund.  See 19 C.F.R. § 24.24(e)(4)(iii) & (iv) (refunds of other than export HMT and refunds of export HMT).  Customs acknowledged that some exporters would face difficulties in providing the requested documentation.  67 Fed. Reg. at 31,950.  To address that concern, Customs expanded the types of documentation it would accept as proof of payment so long as the other types of documentation "clearly show that the payments were made for export fees (as opposed to other harbor maintenance fees), in the amounts sought to be refunded, and by the party requesting the refund."  Id.  Customs considered and accommodated the concerns of exporters who may not have retained certain documentation, by providing additional means of documenting their payments.  19 C.F.R. § 24.24(e)(4)(iv)(C).  The regulation's documentation requirement has allowed Customs to verify and refund $77,453,118.80 worth of pre-July 1, 1990 export HMT payments.

Given the decisional landscape for HMT refunds—an obligation to refund unconstitutional HMT collections comingled with valid HMT payments, an unreliable electronic HMT database, and the absence of government-retained HMT payment documentation prior to July 1, 1990—the amended HMT refund regulation provides a reasonably flexible process for the efficient refund of claims while ensuring the protection of the Trust Fund.  The court must therefore defer to the agency's reasonable gap-filling and accord the regulation controlling weight.  Haggar, 526 U.S. at 392.

Court No. 07-00041                                                                                                          Page 10

Nonetheless, Plaintiff argues that the refund regulation is "contrary to law" because the regulation allegedly conflicts with a presumption of "correctness" that Plaintiff believes attaches to Customs' HMT database. See Pl.'s Mem. Law Supp. Mot. Summ. J. 20-24; Pl.'s Reply Mem. in Opp'n to Def.'s Cross Mot. Summ. J. and in Supp. Pl.'s Mot. Summ. J. 16. When promulgating the refund regulation, Customs expressly rejected sole reliance on the HMT database for refunds because the database was too unreliable. 67 Fed. Reg. at 31,950 ("Customs experience with older payments recorded in the database has shown that the database is unreliable. Customs therefore cannot rely exclusively on that record source to confirm export fee payments, and exporters will have to provide that documentation."). To overcome this legislative fact, Plaintiff argues that the court should apply a presumption of correctness against Customs. According to Plaintiff, the disputed HMT export payments within the HMT database should be "presumed correct" because those amounts were entered by Customs (or its agents) into Customs' HMT database. The burden, Plaintiff argues, should be on Customs to overcome the presumption with specific evidence that the $782,406.45 is unreliable.

There is a temporal problem with Plaintiff's argument. A presumption of correctness may have attached to the HMT database at one time, but subsequent events, namely, Customs' HMT refund rulemaking and acknowledgement that the HMT database was unreliable and inaccurate, now preclude any such attachment in Plaintiff's action under 28 U.S.C. § 1581(a). A presumption of correctness does not attach to the HMT database as Plaintiff argues, but to the factual components of Customs' protest decision, which in this case is the legislative fact of an unreliable HMT database.

To further explain, Customs' protest decisions enjoy a statutory presumption of correctness. 28 U.S.C. § 2639(a)(1) (2000). Despite its name, the statutory presumption of correctness applicable in customs cases is not a true evidentiary presumption governed by Federal Rule of Evidence 301, but rather an "assumption" that allocates to plaintiff the burden of proof on contested factual issues that arise from the protest decision. Universal Elecs., Inc. v. United States, 112 F.3d 488, 492 n.2 (Fed. Cir. 1997); 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice & Procedure Evid. § 5124 (2d ed. 2008) ("Rule 301 does not apply to 'assumptions'— rules for allocating the burden of proof that are often mislabeled as 'presumptions.' . . . the best known include: . . . the 'assumption' that official duty has been regularly performed."). It is a procedural device that codifies the presumption of regularity accorded government action. H.R. REP. NO. 96-1235, at 58 (1980), reprinted in 1980 U.S.C.C.A.N. 3729, 3769-70 ("The Committee does not intend to impose a limitation on the presumption of regularity and legality which is normally accorded to actions of a government agency or official. Rather, the Committee intends to specifically emphasize the propriety of that presumption as it applies to civil actions commenced under section 515, 516, and 516A of the Tariff Act of 1930."). The presumption of regularity found application in early U.S. customs cases to allocate to plaintiffs the burden of proof. See, e.g., Arthur v. Unkart, 96 U.S. 118, 122 (1877) ("[T]he conduct, management, and operation of the revenue system seem to require that their decisions should carry with them the presumption of correctness. . . . [T]he . . . collector ha[s the] power to act in the

first instance upon the question in dispute, and he who insists that such action is in violation of law must make the proof to show it.").

For Plaintiff's 1581(a) action, which challenges Customs' HMT refund regulation and the underlying legislative fact of an unreliable HMT database, the presumption of correctness therefore operates in exactly the opposite manner than Plaintiff suggests. The burden of proof is not on Customs to demonstrate that the $782,406.45 is unreliable, but rather on Plaintiff to produce evidence that demonstrates by a preponderance that the $782,406.45 recorded in the HMT database is accurate and export-related. See Universal Elecs., 112 F.3d at 492 (explaining operation of presumption of correctness to Customs' classification decisions).

Plaintiff made some effort to carry its burden by proffering uncontested evidence regarding the general HMT collection bureaucracy into which Plaintiff made its payments. Plaintiff, however, did not proffer any specific evidence about its HMT payments from its own records. Customs, in turn, proffered an uncontested declaration of the Director of Customs' National Finance Center responsible for processing HMT payments and refunds, which declaration outlines corrections that have been made to the HMT database demonstrating its general unreliability (noted above, see supra at 8). Plaintiff then filed its motion for summary judgment, arguing that the $782,406.45 recorded in the HMT database is conclusively export-related, not because Plaintiff proved this fact with specific evidence from its own records, but because Customs failed to overcome a "presumption of correctness" that Plaintiff argues attaches to the HMT database.

Court No. 07-00041                                                                                                  Page 13

Rather than prove its case, Plaintiff attempts to change the ground rules and shift to Customs the burden of proof on the ultimate issue—whether the $782,406.45 is unreliable or accurate and export-related. This the court will not do. As explained above, Plaintiff has the burden of proof on contested factual issues arising from the protest decision. See Universal Elecs., 112 F.3d at 492. In challenging the HMT refund regulation as it applies to Plaintiff's "specific factual situation," Haggar, 526 U.S. at 392, Plaintiff evidently cannot establish from its own records or otherwise that the $782,406.45 is accurate and export-related. By relying solely on its theory of the presumption of correctness, Plaintiff has failed to raise a genuine factual issue regarding the soundness of the legislative fact that the HMT database is unreliable.[2] Thus, Plaintiff has not demonstrated that the HMT refund regulation represents an "unreasonable implementation" by Customs of the HMT's statutory purposes or Customs' obligation to refund unconstitutional HMT collections under U.S. Shoe. Id.

### V. Conclusion

Customs' HMT refund regulation, 19 C.F.R. § 24.24(e)(4)(iv), represents a reasonable exercise of Customs' rule making authority contained in 26 U.S.C. § 4462(i). Plaintiff's failure to comply with the regulation requires that Plaintiff's motion for

---

[2] The standard for determining whether there is a genuine factual issue "mirrors the standard for a directed verdict . . ., which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict . . . . In essence, . . . , the inquiry under each is the same: whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 250-52.

Court No. 07-00041                                                                                      Page 14

summary judgment be denied and that Defendant's motion for summary judgment be granted.  The court will enter judgment accordingly.

                                                                                                    /s/ Leo M. Gordon
                                                                                                  Judge Leo M. Gordon

Dated:   January 29, 2009
        New York, New York

Case 1:07-cv-00041-LMG   Document 26-2   Filed 01/29/09   Page 14 of 16

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CHRYSLER CORPORATION,<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br><br>      Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 07-00041 |

**JUDGMENT**

This case having been submitted for decision, and the court, after due deliberation, having rendered an opinion; now in conformity with that opinion, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment is denied; it is further

**ORDERED** that Defendant's motion for summary judgment is granted; and it is further

**ORDERED** that judgment is entered for Defendant.

                     /s/ Leo M. Gordon
                     Judge Leo M. Gordon

Dated: January 29, 2009
     New York, New York

## NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                       Deputy Clerk